PUGET SOUND AGRICULTURAL CO. *v*. PIERCE COUNTY.

1 w t l59
20   153

The 4th article, of the treaty of June 15, 1846, between Great Britain and the United States—compromising and adjusting their respective rights over the North-western coast of America—conferring title to appellants, in its property—is but declaratory of the law of nations, which in case of change of sovereignty leaves private rights and relationships undisturbed.

The words "shall be confirmed" in said treaty construed: The effect was to vest title in appellant, in its property, at once, upon the ratification of the treaty, and is to be considered by the Court, as equivalent to a legislative act to that effect.

The fact that its lands may not have been segregated from the public domain, would not prevent title from vesting in appellant.

Though it be conceded the *legal* title to the lands yet remains in the United States, appellant has such an equitable interest therein, as is subject to taxation.

The establishment by appellant of surveys and boundaries to its lands, estops it from resisting a tax, for want of identification of property, founded on such description.

The Territory, in taxing land, does not attempt to determine in whom the title vests, but leaves such determination to the parties interested.

The taxing power is one of the largest of sovereignty and will not be presumed to have been relinquished.

A law, levying tax on "real property," embraces every species of title whether inchoate or complete.

The failure of an assessor, to assess other lands liable to taxation, does not release appellant from payment of taxes on its lands, subject to taxation. The law provides for amending assessment rolls so as to embrace omitted property and if the tax-officers fail to do their duty in this respect, they may be compelled to discharge the same.

Appeal from the District Court of Pierce County.

Opinion by Wyche, Associate Justice.

At the May term, 1859, the county commissioners' court of Pierce county ordered certain lands within that county, claimed by the plaintiffs in error—amounting to about one hundred and sixty-one thousand acres—to be assessed for taxes. From this order, upon an agreed state of facts, the plaintiffs in error appealed to the District Court of Pierce county, and at the March term, 1860, the District Court affirmed the order of the county commissioners' court, and rendered a *pro forma* judgment. From this judgment the case is appealed to this Court.

The following is the agreed statement of facts upon which the case was heard in the District Court, and upon which it has been argued in this Court, and which will substantially present the facts necessary to a proper understanding of this case. It is admitted on the part of the appellants as follows:

"1.   That the appellants have claimed to be the owners of the lands on which they are required to pay taxes by the appellee, and that they have had the same surveyed and platted, and the plat thereof has been by them filed in the office of the Surveyor General for the Territory of Washington.

"2.   That the Government of the United States, in surveying the lands adjacent to the said claim of appellants, has stopped the section lines at the boundaries of said claim, and has not included the same in the public surveys.

"3.   That a portion of the land included within the boundaries of said claim, has been occupied as a military station by the Government of the United States, said Government paying rent therefor to said appellants.

"4.   That said appellants have attempted to eject, by process of law, persons occupying a portion of said land, and claiming the same under the provisions of the donation law."

It is admitted by the appellees as follows:

"1.   That a large portion of the lands for which said Company are taxed, are unenclosed lands, and a portion thereof is occupied and claimed by citizens of the United States, claiming

the same adversely to the appellants, and under, as they allege, the provisions of the donation law.

"2. That American citizens in the county of Pierce, who have lived over four years on their donation claims, have not been taxed for the same, although they are outside of the claim of the appellants; nor is there any tax levied on any real estate in said county, other than the lands of said appellants.

"3. The Government of the United States has not designated the metes and bounds of the claim of the Puget Sound Agricultural Company, except by recognizing the metes and bounds set out by the Company, in its instructions to the Surveyor General.

"4. That the land occupied by the Government of the United States as a military station, and for which rent was paid to said appellants, had some old buildings situated thereon, which have since been torn down, the said Government still occupying said land and paying rent therefor."

Wallace & Chenoweth,
*Attorneys for Appellants.*
Smith & Garfielde,
*Attorneys for Appellees.*

And the following additional facts were agreed upon between the parties:

"1. It is agreed that the Puget Sound Agricultural Company was organized in Great Britain, and has remained and continued a foreign association, joint stock company or corporation.

"2. That the members of said Company, or a majority thereof, were, and still continue to be non-residents of the United States, and subjects of a foreign Government."

A variety of questions, directly and incidentally, arise in this case, but it is considered that a determination of the one following will dispose of the matter in issue:

1. Did the Puget Sound Agricultural Company acquire under the treaty concluded with Great Britain, June 15, 1846, such a title to the lands in controversy as subjects them to taxation?

21

2.   If the Company possess a taxable title, has the Territory enacted any law under which they may be taxed?

The Court, it may be remarked, has not felt entirely free from embarrassment in considering this case, as it seemed not an unreasonable view, that some action by the political department of the Government was necessary before the treaty could be a rule for the Court, and before the Court could intelligently dispose of the question here.   A majority of the Court, however; have reached a different conclusion, and with some diffidence, the questions involved will now be briefly examined.

A "state of doubt and uncertainty" prevailing between the United States and Great Britain respecting their rights of sovereignty over "the territory on the North-west coast of America lying westward of the Rocky or Stony Mountains," a treaty was concluded between these two powers, June 15, 1846, amicably compromising and adjusting their respective rights over said territory.

At that time the Puget Sound Agricultural Company were engaged in agricultural enterprises in the Territory embraced in the treaty, on a large scale, and were claiming large tracts of land as a Company duly incorporated and organized in Great Britain.   The existence of the Company and their rights were recognized by the treaty, the 4th article thereof providing that "the farms, lands and other property of every description belonging to the Puget Sound Agricultural Company, on the North side of the Columbia river, shall be confirmed to the said Company.   In case, however, the situation of those farms and lands should be considered by the United States to be of public and political importance, and the United States Government should signify a desire to obtain possession of the whole or any part thereof, the property so required shall be transferred to the said Government at a proper valuation, to be agreed upon between the parties."

In what manner, then, did the treaty affect the rights of the Company? The law of nations as now expounded, even in cases of conquest, does no more than displace one sovereignty for another, leaving private property and rights undisturbed,

and existing in the same relation to each other under the new as the old sovereign. Much more may such be the law in the amicable adjustment of national boundaries as in this case. In the case of the United States *v.* Percheman, 7 Peters, page 52, Chief Justice Marshall said: "It may not be unworthy of remark, that it is very unusual, even in cases of conquest, for the conqueror to do more than displace the sovereign and assume dominion over the country. The modern usages of nations, which have become law, would be violated. That sense of justice and of right, which is acknowledged and felt by the whole civilized world, would be outraged if private property should be generally confiscated, and private rights annulled. The people change their allegiance—their relation to their ancient sovereign is dissolved, but their relations to each other and their rights of property remain undisturbed."

The treaty, therefore, merely confirms to the Company rights existing under the law of nations and recognized by the civilized world, and it is conceived if there had been no stipulation in the treaty confirming to the Company the lands and other property in the Territory belonging to them, the Government of the United States would have been bound to respect their rights by the law of nations. The treaty, however, placed their rights upon a definite stipulation and rendered perhaps useless a discussion of the question here raised, although the observations here made are thought to be proper in connection with the treaty, and in considering the rights of the Company under it. The language of the treaty is that "the farms, lands and other property of every description belonging to the Puget Sound Agricultural Company, on the North side of the Columbia river, shall be confirmed to the said Company."

In Foster & Elam *v.* Neilson, 2 Peters, page 252, and in the United States *v.* Percheman, 7 Peters, page 51, the Supreme Court, in the construction of the treaty between the United States and Spain, of February 22d, 1829, considered the force and effect of the words "shall be ratified and confirmed."

The language of the treaty under consideration is, "shall be confirmed." In 2 Peters, the Court considered that the

words "shall be ratified and confirmed" imported a contract, and that the treaty addressed itself to the political department of the Government, and that legislative action would be necessary before the treaty could be a rule for the Court, and that those words did not act directly on the grants, but merely pledged the faith of the Government to pass the necessary legislation. In the same case, the Court, while declaring a treaty between two nations generally in its nature a contract and not a legislative act, asserts that in the United States a different principle is established, and that a treaty under our Constitution is the law of the land, and hence to be considered by the Courts equivalent to a legislative act, whenever the treaty was designed to operate of itself without the aid of the legislative department. The same Court, however, in the case cited in 7 Peters, to some extent modified and changed the construction previously placed on those words of the treaty, and although the Court placed their new construction of the treaty mainly on the ground of a difference discovered between the American and Spanish originals, the Court at the same time employ language that would show, perhaps, that they were not entirely satisfied with their previous construction of those words, or at least, that their previous construction should be received with certain exceptions. The Court say, "although the words 'shall be ratified and confirmed' are properly words of contract, stipulating for some future legislative act, they are not necessarily so. They may import that they shall be ratified and confirmed by force of the instrument itself." Whether, therefore, the words "shall be ratified and confirmed," imply a contract calling for legislative action, or whether they imply a ratification and confirmation by force of the instrument itself, is to be determined by a construction of the treaty in which they are employed and the connection in which they are used and the purposes intended to be effected by them.

In this case it will be observed that the treaty provides that not only the lands belonging to the Company shall be confirmed to them, but "other property of every description."— At the time of the treaty, and at this time, the Company were

and are possessed of a large amount of personal property, farming implements, stock, etc., etc. It was never, however, considered by them, nor contemplated by the treaty, that any action of Congress was requisite to give them such a title to their personalty as would enable them to fully use and dispose of the same, and yet an examination of the treaty shows that the treaty confirms to the Company no higher title or confers no greater interest upon them to their other than to their landed property; the treaty recognizing and placing the property belonging to them of every description upon precisely the same footing; the United States reserving the right to have the property of the Company transferred to them, if the United States from "public and political considerations desired to possess the same." It will be observed, too, that possession is recognized to be in the Company, and the treaty concedes that the Government has no right to the possession of the property until the Company are paid for the same at a "proper valuation to be agreed upon between the parties."

The situation of the Company, therefore, being considered and the provisions of the treaty, it is believed that the treaty recognized and confirmed to the Company a present and immediate vested interest in their lands and other property from and after the date of its ratification, and that the treaty of itself so operated upon the property belonging to the Company, whatever it might be, without any legislation from Congress. The Company had to do no act to perfect their title and were required to pay no consideration to the Government, either in money or services, and the sixth article of the Constitution of the United States declares treaties to be the supreme law of the land, and hence to be recognized by Courts as equivalent to legislative acts, whenever they were designed to operate of themselves.

To this view it has been objected that the treaty recognized and confirmed no interest to the Company to these lands, because it did not describe them, and because neither by the treaty or any legislative act have the lands been segregated from the public domain, and that such segregation is necessary before

any title can vest.    The case of Fremont *v.* The United States, 17 Howard, page 542, is in this feature analagous to the case here.    On the 29th February, 1844, Micheltorrena, Governor of California, granted to Juan B. Alvarado a tract of land known as Mariposa, to the extent of ten square leagues, within the limits of the Sierra Nevada and the rivers Chowchilla of the Merced and San Joaquin, as his property.    The title of Fremont was derived from Alvarado.    As within the limits here described there were more that ten square leagues of land, it was contended that the grant conveyed no present and immediate interest in the land until a survey was made and a segregation effected, and that without such survey the grant was too indefinite to pass any vested interest.

In the opinion of the Court in that case, Chief Justice Taney says:   "It is argued that the description is so vague and uncertain that nothing passed by the grant; and that he had no vested interest until the land was surveyed and the part intended to be granted severed by lines or known boundaries from the public domain, but this objection cannot be maintained."   And the Court further says:   "The right to so much land to be afterwards laid off by official authority in the territory described, passed from the government to them by the execution of the instrument granting it."   Other authorities on this point might be cited, but the Supreme Court of the United States having decided the question, further reference to authorities is believed useless.

It may be conceded, however, that the fee to the lands here is not in the Company, and will not vest, until legislative action is had in the premises, and yet it is believed that the United States holds the fee in trust for the Company, and that the Company · possess such an equitable title to the lands as subjects them to taxation.    It has been repeatedly ruled by the Courts that lands held by a patent certificate might, before the patent issued, be subject to taxation.    Such is the law in perhaps all the Western States, where a large amount of lands have been sold under such a title.

In Carroll *v.* Perry *et al.*, 4 McLean, U. S. Circuit Court

Rep., page 25, the Court say: "It is assumed that at the time the land was assessed for taxation, the fee was in the United States, and consequently it was not liable to taxation. This position cannot be maintained. It imposes a limitation on State powers which does not come within the delegated powers of the Federal Government." And the Court in the same opinion say, "The taxing power of a state may reach everything within a State which can be denominated property. It may be made to embrace all equitable credits of whatever description they may be."

In Carroll *v.* Safford, 3 Howard, page 441, the law was held by the Supreme Court of the United States, the Court say:— "When the land was purchased and paid for, it was no longer the property of the United States, but of the purchaser. He held for it a final certificate, which could no more be cancelled by the United States than a patent. It is said the fee is not in the purchaser, but in the United States, until the patent shall be issued. This is so technically at law, but not in equity. The land in the hands of the purchaser is real estate, descends to his heirs, and does not go to his executors or administrators.— Now why cannot such property be taxed by its proper denomination as real estate. When sold, the Government, until the patent shall issue, holds the mere legal title for the land in trust for the purchaser, and any second purchaser would take the land charged with the trust."

Whether, therefore, the fee to the lands be in the Company or held by the United States in trust for the Company, it is considered that the Company possess such an interest in the lands as subjects them to taxation.

It has been argued, however, that even if the Company possess a taxable title to their lands, that inasmuch as neither the treaty nor Congress declares what lands belong to them, a tax is impracticable. The treaty says, all lands "belonging" to the Company "shall be confirmed" to them. While true that neither the treaty nor Congress defines the lands that do belong to the Co., the Co. by their own acts and admissions in connection with the action of the Government, is estopped from deny

ing the boundaries as taken by the assessor. The agreed state of facts shows that the Company do claim the precise lands taxed as lands "belonging to them under the treaty, and that they have had the same surveyed and a plat thereof filed in the Surveyor General's office of this Territory, and that the United States, in surveying lands adjacent to the Company's, have stopped the section lines at the boundaries as claimed and platted by the Company. The Company, therefore, come into this Court claiming to own the lands taxed, but say they have no such title to them as will subject them to taxes, but admitting if their lands be taxable that the assessor has assessed the lands correctly. The treaty says "all lands belonging" to them, and they must be considered the best judges of what lands do belong to them. They cannot both affirm and deny at the same time; it is either their land or it is not. If the grant under which they claim is either legal or equitable, it is fully protected by the treaty, and a confirmation would relate back to the date of its execution. Should the plaintiff's position be maintained and their grant be confirmed, they would escape during the pendency of this legislation, one of the burthens which society has imposed upon property." Robinson *et al. v.* Gaar, 6 Cal., page 273.

The same plea might be urged by any other party claiming lands where the title was unadjusted and in litigation. Our revenue law provides that all lands assessed upon which the taxes have not been paid, shall be returned as delinquent, and as delinquent lands shall be offered for sale, and if no person will buy them for the tax due then the treasurer shall buy them for the county, and so in this case, if the lands do not belong to the Company the Company will not be prejudiced by their sale. The lands belong either to the United States or to the Company. If to the former the Company have nothing to do with their sale, and if they belong to the Company they should pay the tax assessed against the land.

The assessment is against the land, and if no one owns the land no one need pay tax on it. The Territory does not determine the question of title, but merely assesses the land and

leaves it to other parties to determine who does own the land, and whether they have such an interest in the land as will make it their interest to pay the tax assessed. As in this case the Company have defined their boundaries and caused a plat of their survey to be filed in the Surveyor General's office, the otherwise serious difficulty of boundaries is obviated and no question of boundary or legislation is involved—the Company being estopped by their own acts and admissions from denying the boundaries taken by the assessor.

In dismissing the consideration of the title of the Company to their lands claimed under the treaty and the right of the Territory to tax the same, it may be added that the taxing power is one of the largest of sovereignty, reaching property of every description and operating on all persons and property of the body politic, and in this case it would be unreasonable to presume that either the treaty or the Organic Act intended to deprive the Territory of the right to tax the lands belonging under the treaty to the Puget Sound Agricultural Company, and thus relieving the Company from its due contribution to the support of the Government which was bound to protect the Company in their persons and property. (Providence Bank v. Billings and Pittman, 4 Peters' Rep. Supreme Court United States, page 514.)

It remains now only to enquire if any law has been enacted by the Legislature subjecting these lands to taxes. "An act to provide for the assessing and collecting county and Territorial revenue," declares in the first section: "There shall also be levied a tax of one mill upon every dollar's worth of real and personal property in this Territory for Territorial purposes, and two mills for school purposes, and not to exceed four mills for county purposes." Sec. 2 exempts property belonging to religious, benevolent, charitable, literary or scientific institutions, and Sec. 7 declares, "when any person shall be occupying and claiming any lands by virtue of the law of the United States granting lands to actual settlers thereon, the improvements shall be valued as part of the personal property of such person."—Statutes 1853-4, page 381-2.

22

It will be seen that the act provides for levying a tax upon all " the real and personal property in the Territory." The term real property embraces lands held under such a title as the Company here possess to their lands. Carrol *v.* Safford, 3 Hill, page 441; The Providence Bank *v.* Billings & Pittman, 4 Peters, page 514; Soulard *et al. v.* The United States, 4 Peters, p. 511. In this case the Court say: " The term property as applied to lands, comprehends every species of title, inchoate or complete. It is sufficient to embrace those rights which lie in contract; those which are executory as well as those which are executed."

Sections 2 and 7 are all, it is believed, that make any exemptions. No objection has been raised to the 2d Sec. of the act, but it has been contended that inasmuch as Sec. 7 exempts " donation claims" from taxes, except the improvements thereon, therefore the assessment against the Company here is illegal, and in violation of the 6th Sec. of the Organic Act, which provides that all taxes shall be equal and uniform, and that the property of non-residents shall be taxed no higher than the property of residents. The agreed state of facts admits that the donation claims in Pierce county are not assessed as real property, and that no other lands in the county are, except the lands belonging to the Company, although claimants under the donation act have resided upon their claims for four consecutive years, and are now entitled to patents for the same.

At the time of the passage of the revenue act under consideration, no person had resided on his claim the four required years, and the Legislature very properly taxed merely the improvements on such claims as personal property. Whether these claims should now, after a compliance with the donation act entitling the occupant to a patent, be taxed as real estate, does not necessarily arise in this case, though it would be difficult, perhaps, to adduce any satisfactory reason why they should not be assessed as real property. It is known, too, that but little, if any, real property is held in Pierce county outside of the claim of the Company, except under the donation act.

The revenue act under which these lands have been assessed, it is considered is not in violation of any of the provisions of

the Organic Act. A failure, if any there be, on the part of either or both the assessor or county commissioners' court of Pierce county to assess lands as real property, liable to be taxed as such, would not release the Company from paying taxes on their lands, if they be legally liable to pay taxes on the same. Because all are not called upon to do what they ought to do, will not exempt those who are required to do what the law demands. The law plainly presents the duties of the assessor and the county commissioners' court in assessing and collecting the revenue, and provides that if it is made to appear to the county auditor and assessor that any lands have been omitted from the assessment roll which should be taxed, they shall make the proper corrections; and provides the submission of this roll to the county commissioners' court, who are empowered to make all alterations and corrections in such roll as they shall deem necessary to make the same conform to the revenue act.

If these officers fail to do their duty, they may be made to do the same. As tax payers of Pierce county, the Puget Sound Agricultural Company have the right to require that other property in the county should contribute its due proportion to the support of the Government. If property, however, in the county was not assessed which should have been, the Company should have moved to have the assessment roll amended so as to embrace it. Neither the auditor and assessor, nor the county commissioners' court were asked to do this, but the Company moved the court to correct assessment roll by "striking therefrom so much as is assessed against said Company for the year 1859, upon lands claimed in Pierce county by said Company under the treaty of 1846, with Great Britain."

The Court therefore hold the following to be the law applicable:

1. That the treaty of 1846, between the United States and Great Britain, recognize in the Puget Sound Agricultural Company a vested interest in the lands and other property belonging to them on the North side of the Columbia river, and the title to their lands vested at the ratification of the treaty.

2. That even if it be true that the fee to the lands *in law*

is still in the United States, *in equity* it is in the Company, and the United States hold the fee in trust for the Company.

3.    That not only a vested and legal estate in lands may be taxed, but such an equitable estate as the Company here possess.

4.    That the lands of the Company, therefore, whether the fee be in the Company, or held by the United States in trust for the Company, are liable for taxes.

5.    That the taxing power is one of the largest of Government and of vital importance to its existence, and that it is not to be presumed that the treaty, while recognizing the right of the Company to their lands, and pledging the Government to confirm the same, intended to deprive this Territory of the power of taxing said lands.

6.    That although the treaty does not define the boundaries or lines of the lands belonging to the Company, yet the Company having admitted the lines taken by the assessor to be their true lines, and if they are liable to pay taxes on any lands, they are liable on the lands assessed. No question of boundary or segregation from the public domain is involved in this case, the Company being estopped by their own acts and admissions from denying the lines taken by the assessor.

7.    That even if it be true that the assessor of Pierce county has failed to assess other lands in Pierce county liable to taxes, that fact will not exempt the Company from paying taxes on their lands if they be liable to taxation, but the Company, as tax payers of the county, would have the right to have other property in the county pay its due proportion of the tax.

Oliphant J., dissenting.